# United States Court of Appeals
## For the First Circuit

No. 03-1333

UNITED STATES OF AMERICA,

Appellee,

v.

NANCY J. CHEAL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[The Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Circuit Judge,
Gibson, Senior Circuit Judge*,
and Lipez, Circuit Judge,

William A. Gilmore, Jr., for appellant.
Diane C. Freniere, with whom Michael J. Sullivan, U.S. Attorney, was on brief, for appellee.

November 15, 2004

---
  * Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  The defendant-appellant in this case, Nancy J. Cheal, pleaded guilty to five counts of mail fraud (18 U.S.C. § 1341) and two counts of wire fraud (18 U.S.C. § 1343), after being charged with bilking investors out of more than $2 million in an "international bank trading" scheme.  The District Court then sentenced Cheal to a term of imprisonment of 87 months, with three years of supervised release to follow.  The District Court also ordered Cheal to pay restitution in the amount of $2.1 million.

Cheal now raises four issues on appeal: (1) the compliance of her change-of-plea hearing with the requirements of Rule 11 of the Federal Rules of Criminal Procedure; (2) the evidentiary basis for the court's enhancement for obstruction of justice; (3) the court's failure to grant a downward departure on the basis of her alleged reduced mental capacity; (4) the timeliness of the court's entry of a restitution order.

Cheal's argument about the timing of her restitution order raises an issue of first impression in this circuit.  Congress passed the Mandatory Victims Restitution Act of 1996, Pub. L. No. 104-132, 110 Stat. 1227 (codified as amended in scattered sections of 18 U.S.C.), to provide full restitution to identifiable victims of certain crimes, including mail and wire fraud, regardless of a defendant's ability to pay.  One provision of that act, 18 U.S.C. § 3664(d)(5), directs that "the court shall set a date for the

final determination of the victim's losses, not to exceed 90 days after sentencing." Cheal argues that the restitution order in this case, which was entered 127 days after sentencing, was invalid. As we explain below, any error that the district court may have committed by entering Cheal's restitution order after the 90-day period did not constitute plain error. We therefore affirm Cheal's convictions and sentence in their entirety.

# I.

We take the facts from the presentence report ("PSR"), the transcript of the plea hearing, and the district court's findings. See United States v. Voccola, 99 F.3d 37, 43 (1st Cir. 1996).[1]

At the time of her criminal conduct, Nancy Cheal was 60 years old and lived in a five-bedroom double-wide trailer home along with her second husband and four great-grandchildren. She describes herself as the pastor to a small, nondenominational church in her hometown of Bunnell, Florida.

Beginning approximately eight years before the criminal conduct at issue in this case, Cheal ran a business out of her home called Relief Enterprise, Inc. Cheal claimed to run several

---

[1]Cheal objected generally to the PSR's description of the facts, but she offered no specifics to counter that description. "[I]f the defendant's objections are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR." United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003).

private clubs somehow connected to Relief Enterprise with such names as the "Get America Out of Debt Private Club," the "Fatherless Children Private Club," and the "Senior Citizens' Private Club." Although the purpose served by these clubs is not clear, they seemed to be perpetually short of the funds that Cheal solicited on their behalf.

In October 1999, Cheal organized and began to advertise the investment scheme that led to her criminal convictions.[2] Its basic nature was simple fraud: by falsely asserting that she was an experienced trader in international securities and had the help of another experienced trader, Cheal induced thousands of investors to send her money in the hopes of an astronomical return on their investment. She told investors that the scheme paid 100% of the initial investment per week for twelve weeks.

Cheal was vague about the mechanism behind these remarkable numbers, referring only to "overseas trading" of some kind and the services of a renowned trader of international securities, one of only seven people in the world licensed to trade in a certain (unspecified) kind of investment. She also claimed to have trading experience herself. Cheal insisted that investors' money would not itself be used for the trades; instead, she would place it in a "safekeeping, non-depletion" account, which meant that it would not

---

[2]In addition to this criminal case, her conduct is the subject of a pending civil case brought by the Securities and Exchange Commission, titled S.E.C. v. Cheal, Civ. No. 00-10182-EFH.

be risked in the deal.

Cheal also laced the scheme with religious and charitable elements, sometimes claiming that Relief Enterprise had bought a bank in Oklahoma, which, because it was on an "Indian Reservation," would not be subject to the usual federal regulations and could therefore offer mortgages at extremely low rates to help poor people buy homes. At other times, Cheal claimed that the purpose of the enterprise was to raise money to build a church. Although the precise charitable purposes varied, Cheal consistently maintained that she wanted to benefit the public and "help the little guy."

Along with other employees of Relief Enterprise working at her direction, Cheal disseminated her investment offer through faxes, e-mails, letters, and telephone calls. A referral fee of 1 to 5% also provided an incentive for people to spread the word. As a result of these efforts, Relief Enterprise managed to raise more than $2 million in a few months.

Not surprisingly, Relief Enterprise did not make its promised payments. Originally, the first payouts were to come in late October or early November 1999. As those dates came and went, Cheal offered excuses for the delay, ranging from a death in the trader's family to the Y2K computer bug. Then Cheal's scheme came to the attention of law enforcement.

On October 27, 1999, a disgruntled investor contacted the U.S.

Secret Service with complaints about Relief Enterprise. Because of the use of the mails to carry out the scheme, the Secret Service passed the complaints on to the U.S. Postal Service. On October 28, a postal inspector, Louis Keith, met Cheal at a convenience store near her home for an interview. Cheal signed two declarations stating that she "initially had a solicitation to obtain loans to build a church" and that others had modified this solicitation without her knowledge or consent. Estimating that Relief Enterprise had so far collected between three and four thousand dollars, she said that she would refund the money by November 1 that had been sent to her by wire transfer and would return to the inspector all funds received in letters and packages. Finally, she promised "to cease receiving letters and packages relating to this solicitation and return them to the sender," and she authorized the Postal Service to intercept and return any future packages on her behalf.

On November 8, 1999, Cheal met again with Inspector Keith and gave him a box containing 1,296 checks totaling approximately $171,000.[3] At this meeting, Inspector Keith confronted Cheal with evidence that she had made the 1200% (100% per week over twelve weeks) offer herself to at least one investor. She admitted that she had and that she "may" have made the offer to others.

---

[3] Later that month, the Postal Service returned these checks to their senders.

Cheal, however, was deceiving Inspector Keith at this meeting. Rather than returning to him all of the funds that Relief Enterprise had so far collected, she had in fact instructed her employees to segregate investments into those worth less than $400 and those worth more. The smaller investments she gave to Inspector Keith; the larger investments, equaling at that point at least $1.3 million, she kept.

Subsequently, Cheal contacted the senders of the smaller investments to explain her legal difficulties and to ask them to send their money again by a private courier such as Federal Express or UPS. In some cases, one of Cheal's employees even explained that she had given the postal inspector only checks for less than $400 and had kept the rest and asked the investors to keep this information a secret.[4] Cheal continued soliciting new investments as well.

Cheal used the proceeds from her investment scheme in a variety of ways. She paid off more than $100,000 in personal debt, gave $110,000 to a friend, gave bonuses to her attorney and employees, and made numerous purchases, including a minivan, a new trailer home for $67,000, and a big-screen TV. At one point, she tried to buy a $400,000 home with cash but was turned down.

On February 28, 2001, a grand jury sitting in the U.S.

---

[4]To one investor, for example, a Relief Enterprise employee wrote: "The Postal Inspector requested we send ALL pkgs received back. We sent back all under $400. (Don't tell him!)"

District Court for the District of Massachusetts returned an indictment charging Cheal with defrauding others of more than $2.1 million. The indictment listed five counts of mail fraud under 18 U.S.C. § 1341 and two counts of wire fraud under 18 U.S.C. § 1343. Cheal was arrested on March 2, 2001, in the Middle District of Florida and released on bond. On March 13, 2001, Cheal appeared for arraignment before the U.S. District Court in Massachusetts, which appointed counsel for her.

On September 6, 2001, the District Court ordered a psychiatric evaluation of Cheal. On January 8, 2002, after psychiatrists hired by the government and the defense had both advised that Cheal was competent to stand trial, the District Court agreed and the case moved forward.

On October 15, 2002, the first day of trial, Cheal pleaded guilty to all seven counts against her, and the court held a change-of-plea hearing as required by Rule 11 of the Federal Rules of Criminal Procedure. The Probation Office then prepared a PSR recommending a total offense level of 31 under the federal sentencing guidelines: a base offense level of 6, plus 13 because the total cost of the scheme to victims was more than $2.5 million, plus 2 for more-than-minimal planning, plus 2 because the crimes involved mass-marketing, plus 2 because Cheal misrepresented herself as acting on behalf of a charitable or religious agency. In addition, the PSR determined that Cheal should receive a four-

level upward adjustment for her leadership role and a two-level upward adjustment for willful obstruction of justice. The PSR recommended that she receive no credit for acceptance of responsibility.

At the sentencing hearing on February 20, 2003, Cheal objected to the upward adjustment for willful obstruction and asked for a downward departure based on diminished mental capacity. The district court ultimately accepted the PSR's recommendations, except that it did grant a two-level downward adjustment for acceptance of responsibility. It also ordered restitution. Cheal filed a timely notice of appeal on March 4, 2003.[5]

## II.

Appellants who claim relief because of an allegedly flawed change-of-plea hearing face a high hurdle when they have not first raised their objections in the court below. See United States v. Pagan-Ortega, 372 F.3d 22, 27 (1st Cir. 2004). In such cases, we

---

[5] Cheal also filed three motions around this time, all of which were denied. On March 24, 2003, Cheal filed a motion with this Court asking that we stay her incarceration pending appeal. On March 27, 2003, we denied that motion without prejudice because she had not sought such relief in the court below and had not shown that she met the requirements of 18 U.S.C. § 3143(b)(1) (appellant shall be detained unless not likely to flee or pose a danger to the community, and appeal is not for purpose of delay and raises a substantial question of law or fact). On April 1, 2003, Cheal filed a motion to stay with the district court, which the court denied the next day on the grounds that Cheal had not filed a motion for relief from judgment of conviction. On April 3, 2003, Cheal filed a motion with the district court for relief from judgment of conviction, which the court denied the same day without comment.

review only for plain error.  <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 733-34 (1993); <u>see</u> Fed. R. Crim. P. 52(b).  After this case was briefed and argued, the Supreme Court decided <u>United States</u> v. <u>Dominguez Benitez</u>, __ U.S. __, 124 S. Ct. 2333, 159 L. Ed. 2d. 157 (2004), which further refined the standard for granting relief based on a Rule 11 error that had not been preserved below.  The Court held that

> a defendant who seeks reversal of his conviction after a guilty plea, on the ground that the district court committed plain error under Rule 11, must show a reasonable probability that, but for the error, he would not have entered the plea.  A defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding.

124 S. Ct. at 2340 (citations and internal quotation marks omitted).  We apply this standard here.  Of course, if there was no error at all, we never reach the issue of the probability of a different result.

## A. Validity of Cheal's Plea Colloquy

Cheal first contends that she consistently asserted her legal innocence throughout the hearing, never fully agreeing to the government's allegations and case against her, and that the court therefore lacked a sufficient factual basis to accept her plea.  Second, Cheal claims that the court's failure to conduct the change-of-plea hearing in accordance with Rule 11 meant that she did not enter her plea intelligently, knowingly, and voluntarily.

Although Cheal's behavior during the plea colloquy was erratic, her admissions, when combined with the government's evidence, provided a sufficient basis for the plea, and the court's procedure complied as a whole with Rule 11.[6]  There was no error in the conduct of the change-of-plea hearing.

1.  *The Factual Basis for Cheal's Plea of Guilty*

Rule 11 requires that

there be an admission, colloquy, proffer, or some other basis for thinking that the defendant is at least arguably guilty. . . .
. . . .
On a plea, the question under Rule 11(f) is not whether a jury would, or even would be likely, to convict: it is whether there is enough evidence so that the plea has a rational basis in facts that the defendant concedes or that the government proffers as supported by credible evidence.

United States v. Gandia-Maysonet, 227 F.3d 1, 6 (1st Cir. 2000). Cheal pleaded guilty to mail and wire fraud.  To prove these crimes, the government must show three elements: (1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of that scheme.  United States v. Martin, 228 F.3d 1,

---

[6]In our review, we consider the version of Rule 11 that was in effect at the time of Cheal's change-of-plea hearing.  See United States v. Mercado, 349 F.3d 708, 709-10 (2d Cir. 2003), cert. denied, __ U.S. __, 124 S. Ct. 1190, 157 L. Ed. 2d 1220 (2004).  An amended version became effective on December 1, 2002, after Cheal pleaded guilty.

15 (1st Cir. 2000). "The factual predicate for the requisite <u>mens</u> <u>rea</u> may be inferred from all the evidence alluded to at the Rule 11 hearing." <u>United States</u> v. <u>Marrero-Rivera</u>, 124 F.3d 342, 352 (1st Cir. 1997); <u>see</u> <u>also</u> <u>United States</u> v. <u>Japa</u>, 994 F.2d 899, 903-04 (1st Cir. 1993).

It is true that Cheal made a number of statements throughout the change-of-plea hearing contesting the government's version of the facts against her. After the government's initial recitation of facts, for example, Cheal responded: "I agree with ten percent of what he said, about ten percent of it is correct." She then delivered a rambling narrative of her own version of the facts, which included several denials that she was running or even knew about the investment scheme promising a 1200% return over twelve weeks. Cheal claimed that she had simply solicited loans to purchase a bank that would help fund low-cost mortgages, and that her employees had modified this plan without her consent or knowledge. At first, Cheal claimed she had never sent faxes to anyone. Then, when the court asked why she had a fax machine in her home, she said she had sometimes faxed back "a prayer request," and then that she had responded to people "after they had been promised a hundred percent return."

Cheal also read a prepared statement in which she admitted that she misrepresented herself as being an experienced securities trader, that she "recklessly mismanaged the loan proceeds received

for Relief Enterprise from lenders," that "in setting up these programs I made reckless decisions and judgments," and that she

> recklessly allowed persons in my office . . . to misrepresent the facts and nature of my loan program to prospective lenders which resulted in persons sending loan [sic] and money and applications to me with false information about the program. . . . Among the false statements provided to such lenders was that: (1) lenders could expect 100 percent of the loan value return from each one of their loans for twelve weeks . . .; and (2) that all lenders' moneys were to be kept in a secured lenders' account. So, to all these charges I do plead guilty.

In a subsequent exchange with Cheal, the court tried to determine whether Cheal was admitting to having made the 1200% misrepresentation herself, or whether she was admitting only to failing to correct her employees' misrepresentations, which she had overheard:

> THE COURT: So you acknowledge that people on your behalf were making these statements --
> THE DEFENDANT: Yes, your honor.
> THE COURT: -- but you did not correct them?
> THE DEFENDANT: Yes -- well, I corrected them when I was aware of it, but I did not correct them when I found out afterwards. I couldn't do anything about it, I thought. The attorney since advised me there was something legally I could have done.

The government then submitted for the court's consideration a number of documents and faxes, which Cheal admitted were all in her handwriting, and recorded telephone conversations, in which Cheal admitted participating. This evidence showed conclusively that Cheal herself had represented that the scheme would return 100% per week for twelve weeks, that she was an experienced securities

-13-

trader, that she had secured the services of another experienced trader, and that the lenders' money would be kept in a safe, nondepletion account and would not itself be risked in the trades.

This proffer of evidence, when combined with Cheal's own statements to the court, satisfied Rule 11's requirement of a factual basis for a plea of guilty, even if Cheal never admitted explicitly to a "knowing and willing participation" in the scheme, Martin, 228 F.3d at 15. On the basis of what it described as "her statements to the court, on the tapes that she acknowledges are in her voice, [and] the letters and statements that are in her hand and/or signed by her," the district court was free to infer that Cheal had the requisite mens rea, Marrero-Rivera, 124 F.3d at 352, and that the plea otherwise had a rational basis in fact.[7]

Cheal's argument is fundamentally flawed because it assumes that the district court could rely only on her admissions in court to find a sufficient factual basis to accept her plea. As Gandia-Maysonet and our other cases make clear, the court may find such a basis either in the defendant's admissions or from the government's

---

[7] Cheal's admissions also supported a plea of guilty on a theory of willful blindness, permitting a defendant to be charged with knowledge of a fact if she deliberately closed her eyes to something that otherwise would have been obvious to her. See United States v. Gabriele, 63 F.3d 61, 66-67 (1st Cir. 1995). As the court put it: "Now, to the extent that the defendant doesn't admit every detail of the government's evidence, she does admit without question that she was reckless as to the consequences of what she and people on her behalf did do in making representations and in obtaining money from others."

presentation. In this case, not only did Cheal admit to substantial wrongdoing, including acknowledging repeatedly that she made numerous "reckless" decisions with investors' money, but the government also made extensive proffers of evidence -- faxes in Cheal's handwriting and telephone calls in her voice -- that it intended to use at trial. Given the wealth of information available to the court from these two sources, it did not err in finding a sufficient factual basis to accept Cheal's plea of guilty.

2. *Cheal's Understanding of the Nature of the Charges and the Consequences of Her Plea*

Rule 11 of the Federal Rules of Criminal Procedure ensures that a defendant who pleads guilty does so with an "understanding of the nature of the charge and the consequences of his plea." McCarthy v. United States, 394 U.S. 459, 467 (1969). Cheal argues repetitiously that her insistent denials at the change-of-plea hearing show that she could not have understood the charges against her or the consequences of her plea. We have already rejected this argument's premise -- that Cheal did not admit to enough facts to allow the court to accept her guilty plea. Moreover, her factual disagreements, arguably skirting the edges of culpability, reveal the extent to which she fully understood the charges against her and the consequences of her plea.

In further support of her claim of confusion about the

consequences of her plea, Cheal notes that, at one point in the hearing, she denied that she had told investors that their money would not be risked in the trades, and she said that a business associate of hers "would come here and testify to this if it goes to the jury. . . . I was using my own money to trade." Cheal contends that this reference to a possible trial "clearly shows the confusion she had regarding the purpose of the plea hearing. At the same time that Ms. Cheal is asserting her innocence, she is stating that she has witnesses who would testify at trial. Based on these statements alone an obvious confusion exists."

We disagree. In assessing Cheal's claim of confusion, we must review the totality of the Rule 11 hearing.

> What is critical is the substance of what was communicated by the trial court, and what should reasonably have been understood by the defendant, rather than the form of the communication. At a minimum, Rule 11 requires that the trial court address the defendant personally in open court to ascertain that his plea is voluntary and intelligent.

United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995) (citations omitted). We find that this minimum requirement was met here when, later in the hearing, the court explicitly asked Cheal if she understood that, with a guilty plea, she was giving up her right to a jury trial and her right to call witnesses on her behalf. To those questions, Cheal answered yes.

Cheal also complains that, after the government's proffer, the court did not immediately follow up by asking her whether she

agreed with the evidence presented.  Instead, the court launched into a series of questions asking Cheal whether she understood the maximum penalties under the mail and wire fraud laws, the sentencing guidelines, her right to trial, her right to counsel, and the other usual inquiries.  "Thus," Cheal says, "despite the [court's] being cognizant of the Appellant's assertion of innocence, [it] makes no further inquiry of the Appellant regarding an acknowledgment of guilt nor does the [court] ascertain through further inquiry whether the Appellant's plea was knowing, voluntary and intelligent."  Yet the colloquy cited by Cheal, required by Rule 11 and routine in change-of-plea hearings, is designed to confirm a knowing, voluntary, and intelligent plea.  In Cheal's case, the colloquy did just that.  Cheal's responses to the court's questions asking whether she understood the proceedings were almost always in the affirmative.  When she  said that she did not understand her right against self-incrimination, the court explained that right to her until Cheal said she did understand it.  Cheal's insistence on that explanation confirms that she was not merely giving mindless answers to the court's other questions.[8]

---

[8] Cheal also overlooks the fact that, when the government had finished its presentation, the court actually asked defense counsel's permission to move on, saying, "Now may I continue with my questioning of the defendant?"  Cheal's counsel responded, "You may, your Honor."  Rule 11 does not require the court to follow a precise sequence of questions, and, in any event, by that point in the hearing, Cheal evidently had had plenty of time to express her disagreement with the government's version of the facts.

There was no error in the court's conduct of the change-of-plea hearing and its eventual acceptance of her guilty plea.

## B. Sentencing Adjustment Based on Obstruction of Justice

Cheal challenges the two-level upward adjustment to her sentence under USSG § 3C1.1 for obstruction of justice, arguing that the court made no "suitable findings" at the sentencing hearing to support the adjustment.[9]  This argument has no merit.

As usual, we review a district court's legal interpretation of the guideline de novo and review the court's fact-finding for clear error, giving due deference to the court's application of the guidelines to the facts.  United States v. Mitchell, 85 F.3d 800, 813 (1st Cir. 1996).  USSG § 3C1.1 provides for a two-level upward adjustment where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation . . . of the instant offense of conviction . . . ."  The adjustment's commentary advises that it applies to, among other kinds of conduct, a defendant who has given a "materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  USSG § 3C1.1, cmt. n.4.  At

_____

[9]All references to the United States Sentencing Guidelines are to the November 2002 version in effect at the time of Cheal's sentencing.  See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("Barring any ex post facto problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.").

Cheal's sentencing hearing, the district court stated that the adjustment was "primarily based on Ms. Cheal's conduct with the postal inspector, Keith.  She did not follow his orders, the money was not returned, and the scheme continued at least for a period of time after that.  It seems to me that does amount to obstruction of justice."

Cheal argues that we should set this adjustment aside because the district court failed to take direct testimony on this point and failed to make a specific finding that her actions "significantly" obstructed the investigation, in the commentary's words.  In support of this argument, she repeats her claim here, made to the district court as well, that the postal inspector never gave her a copy of the laws she was violating and never told her that the laws prohibited her from receiving monies through private couriers like Federal Express as well as through the U.S. mail.

In fact, the district court did address these points at the hearing and quickly rejected them, saying simply: "I understand that, and that objection is overruled."  No more was needed, especially when the court had already adopted the whole of the PSR's factual findings, which thoroughly cover the details of Cheal's meetings with the postal inspector (and do not support her version of the encounters advanced in her brief).  The district court committed no error by imposing the adjustment for obstruction

of justice in the way it did.[10]

**C. Denial of Downward Departure Based on Diminished Mental Capacity**

Cheal argues that the district court erred by failing to hold a hearing on whether she was entitled to a downward departure based on diminished mental capacity.[11]   The decision to hold an evidentiary hearing during the sentencing phase is within the discretion of the district court.  United States v. Robles-Torres, 109 F.3d 83, 85 (1st Cir. 1997).  Consequently, if the district court had denied a request from Cheal for such a hearing, we would review for abuse of discretion.

In this case, however, Cheal did not even make such a request. "It is . . . clear that, at a bare minimum, he who expects to receive a discretionary dispensation must first seek it.  Thus, the failure to ask the district court to convene an evidentiary hearing ordinarily spells defeat for a contention that one should have been held."  United States v. Tardiff, 969 F.2d 1283, 1286 (1st Cir. 1992).  That is so because our review under these circumstances is for plain error only.

---

[10] The Supreme Court decided Blakely v. Washington, ___ U.S. ___, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), after oral argument in this case.  Cheal has not submitted a letter of supplemental authority under Fed. R. App. P. 28(j) challenging her sentence based on Blakely's possible application to the federal sentencing guidelines.  Consequently, we do not address the issue.

[11] USSG § 5K2.13 provides that a "sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity."

Although Cheal registered no such objection at the sentencing hearing, she now contends that the court erred in its description of the evaluations from the psychiatrists for the government and the defense. At the sentencing hearing, the court said that the reports "agree that she's not entitled to a finding of diminished capacity." In fact, the defense psychiatrist's evaluation stated that, while Cheal was competent to stand trial, "it is my opinion that she would meet the statutory criteria of the United States sentencing guidelines for diminished capacity." He added that Cheal "did . . . have a significantly reduced mental capacity."[12]

At the same time, however, the evaluation of the defense psychiatrist contained observations suggesting that Cheal possessed a normal mental capacity, at least at the time of the evaluation. It noted that she did not "appear to have any disorganization in her thought flow, nor does she suffer from any hallucinations. Her intellectual faculties appear to be intact with no cognitive deficits or decrease in her intellectual ability." Ultimately, the psychiatrist concluded that "she knew that what she was doing was wrong, but did not fully appreciate the wrongfulness of her conduct

---

[12] The psychiatrist added that Cheal appeared to hold some bizarre ideas about the United States government. She believed that there are dozens of lawyers working behind the scenes in the White House to bring the United States back to "constitutional law" instead of the current "judicial law." These lawyers intend to abolish the Internal Revenue Service in favor of a consumption tax and have already secretly converted one-third of the country's banks to "treasury banks" backed by the gold standard.

because, in her psychotic state, [she] believed that what she was doing was proper and moral."

Although the district court erred when it stated that both psychiatrists had the same opinion as to Cheal's entitlement to a departure based on mental capacity (they did not), the more critical consideration for plain-error review is whether the reports were so divergent that the court could not reasonably rely on them to reject Cheal's claim of diminished mental capacity without holding an evidentiary hearing. They were not. The court committed no plain error when it stated, on the evidence before it, that "I do not believe that any of the grounds advanced by the defendant are sufficient for a departure."

## D. The Restitution Order

Cheal's last claim of error on the timing of her restitution order presents an issue of first impression for us. As part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Congress passed the Mandatory Victims Restitution Act (MVRA), which, as its title suggests, made restitution mandatory for the victims of certain crimes, including mail and wire fraud, regardless of the defendant's ability to pay.[13]  See 18 U.S.C. §§

---

[13]Restitution for such crimes is not mandatory only where the number of victims is so large and the issues of fact so complex "that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3). While the number of victims here gave the government considerable trouble in compiling a full, accurate list of losses, Cheal has not suggested that this provision applies here.

3663A and 3664. Section 3664, titled "Procedure for issuance and enforcement of order of restitution," provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If a victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

Id. § 3664(d)(5).

At Cheal's sentencing hearing on February 20, 2003, the government asked the district court to order restitution, estimated at around $2.5 million, but requested an additional 90 days under 18 U.S.C. § 3664 to provide a final list of victims and amounts owed. The court informed Cheal of its ruling on this request:

> You shall pay restitution. There will be a restitution order. I cannot now designate the amount nor the payees. And under 18 U.S.C. 3664(d)(5), I will grant a 90-day period for the U.S. Attorney's office to come to a number and share with Mr. Murray [trial counsel for the defense] so that we can have hopefully an agreed amount.

On February 25, 2003, the court entered judgment in the case, stating: "The determination of restitution is deferred until 5/25/03. An amended judgment in a criminal case will be entered after such a determination." On May 21, 2003, the government filed a memorandum with the court identifying 2,350 individual victims and the amounts owed them, which totaled just under $2.1 million.

-23-

On the same day, it served this memorandum on Cheal's trial counsel, Robert Murray.

In the prior three months, however, with the approval of this Court, Cheal had changed attorneys. On March 4, 2003, Cheal had filed her notice of appeal. On April 4, 2003, Cheal filed a pro se motion requesting us to appoint an attorney "to handle my appeal, my stay, and whatever else is necessary at this time." On the same day, we ordered that "new appellate counsel shall be appointed." On April 10, 2003, we appointed Cheal's current appellate counsel, allowed trial counsel (Murray) to "withdraw as counsel for appellant," and ordered Murray to forward the case record to appellate counsel by April 24, 2003. It appears that the district court was not advised of this change in Cheal's counsel.

Finally, on June 27, 2003, the district court issued an Amended Judgment and Order requiring Cheal to make restitution in the amounts and to the victims specified in the government's list. This order noted: "No opposition to these numbers and amounts has been filed."

Cheal makes three arguments based on this history. First, the district court did not enter its order for restitution until June 27, 2003 -- 127 days after the February 20, 2003 sentencing hearing, rather than within the required 90 days. Cheal contends

that this delay rendered the order invalid.[14]  Second, Cheal claims

---

[14]18 U.S.C. § 3664(d)(5) uses two phrases whose precise meanings have not been explored by this Court.  First, § 3664(d)(5) refers to a "final determination of the victim's losses" but not specifically to the initial order for restitution.  Other courts to consider this point have found that "final determination" in this context must mean the initial order itself.  "[T]he provision that a victim may 'petition the court for an amended restitution order' would have no meaning unless the order had been entered." United States v. Stevens, 211 F.3d 1, 4 (2d Cir. 2000).  See also United States v. Jolivette, 257 F.3d 581, 584 (6th Cir. 2001); United States v. Maung, 267 F.3d 1113, 1121 (11th Cir. 2001); United States v. Grimes, 173 F.3d 634, 639-40 (7th Cir. 1999).  We agree with these courts, although we note that, elsewhere, § 3664 does distinguish between the determination and the order.  See §§ 3664 (f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court . . . .") and 3664(f)(2) ("Upon determination of the amount of restitution owed to each victim, the court shall . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid . . . .").

Second, § 3664(d)(5) keys its time periods to "sentencing" -- "10 days prior to sentencing," "90 days after sentencing" -- but does not specify whether this term refers to the sentencing hearing or to the district court's actual entry of judgment.  We conclude that "sentencing" in this provision refers to the sentencing hearing for four reasons.  First, we read this provision in conjunction with § 3664(d)(1), which requires the government to provide the probation officer with a listing of the amounts subject to restitution "not later than 60 days prior to the date initially set for sentencing."  It makes more sense to speak of the district court setting a date for the sentencing hearing, rather than for entry of judgment, which is not usually done on some preset date.  Second, because of the usual uncertainty about precisely when a district court plans to enter judgment, it would be difficult to calculate the date that would fall "10 days prior to sentencing" as provided by § 3664(d)(5) (which provides that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court.")  Third, our interpretation is more consistent with the language of Fed. R. Crim. P. 32(i), titled "Sentencing," which begins: "At sentencing," and goes on to refer to the sentencing hearing.  Fourth, keying this 10-day deadline to the sentencing hearing gives better expression to a Congressional intent to allow the defendant to develop objections to the

-25-

that she was not given notice of, and hence had no opportunity to object to, the government's victims' loss list because the list was sent to her old trial counsel instead of her new appellate counsel. Third, the court should have considered her ability to pay in calculating the amount of restitution owed.

We review restitution orders for abuse of discretion and their subsidiary findings of fact for clear error. United States v. Cutter, 313 F.3d 1, 6 (1st Cir. 2002). If the appellant's challenge is based on a legal conclusion, we review that conclusion de novo. Id. at 6. Where the defendant has failed to object below, however, we review only for plain error. United States v. Theodore, 354 F.3d 1, 8 (1st Cir. 2003). Under this standard, Cheal must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [her] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). After considering Cheal's arguments, we affirm the restitution order in its entirety.

1. *The Timing of the Restitution Order*

Although the government concedes that the order was not entered within 90 days of sentencing, it urges us to overlook this irregularity to further the statute's purpose of increasing the

---

government's data in time to present them at the sentencing hearing.

likelihood that victims of crime will receive restitution from the defendant. The government also argues that the court's statements about restitution at the change-of-plea and sentencing hearings and in the original judgment gave notice to Cheal that she would face a restitution order after a delay of 90 days. Finally, the government notes that Cheal has never objected to restitution, either at the sentencing hearing or after the original judgment, and even now has not identified any actual disagreement with the order.

Cheal had the opportunity to object to the district court's scheduling of a deferred restitution order but did not. When the court entered judgment on February 25, 2003, it deferred determination of restitution until May 25, 2003, and indicated that it would enter an amended judgment at some unspecified time thereafter. Even though it was now a virtual certainty that the restitution order would be entered more than 90 days after her sentencing, Cheal did not object. By failing to object at the time, Cheal subjected her appellate claim of error to plain-error review.

Cheal cites no prejudice from the delay in entering the restitution order. Indeed, as the government points out, she does not claim even now that she disagrees with the government's accounting of her victims' losses and the court's final determination. In an effort to avoid the prejudice showing

required by plain error, Cheal argues that § 3664 is a jurisdictional provision. That is, by not entering a restitution order within 90 days after her sentencing hearing, Cheal argues, the district court no longer had jurisdiction to enter any restitution order. This jurisdictional argument is undermined by § 3664's provision for continued revision of the restitution order in light of later discoveries of losses. Indeed, the title of the provision ("Procedure for issuance and enforcement of order of restitution") advertises its procedural nature, including the 90-day time frame.[15]

The legislative history of the MVRA reveals Congress's

---

[15]See United States v. Vandeburg, 201 F.3d 805, 814 (6th Cir. 2000):

> Section 3664(d)(5) is not a jurisdictional statute. Were we to read it as terminating a court's jurisdiction 90 days after a sentencing hearing, we would be effectively nullifying its provision that a victim may petition the court for an amended restitution order 60 days after the discovery of any additional losses. The MVRA permits amendments to restitution orders to reflect changed circumstances, and neither confers nor terminates a court's jurisdiction.

201 F.3d at 814 (citation omitted). A year later, however, United States v. Jolivette, 257 F.3d 581 (6th Cir. 2001), came to a different and seemingly irreconcilable conclusion: "We believe that [the MVRA] makes clear the congressional intent to prohibit courts from making restitution determinations after the statutory period has run. . . . [W]e hold that when the 90-day clock runs out, the judgment of conviction and sentence, including the restitution provision, becomes final by operation of the statute." Jolivette, 257 F.3d at 584. Strangely, Jolivette did not cite Vandeburg or refer to it in any way. As noted, we reject Jolivette's jurisdictional view of § 3664.

determination to provide full restitution to victims of fraud if at all possible.  The Senate Judiciary Committee, in its report on the bill that would become the MVRA, stated: "It is essential that the criminal justice system recognize the impact that crime has on the victim, and, to the extent possible, ensure that [the] offender be held accountable to repay these costs."  S. Rep. No. 104-179, at 18 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 930.[16]  Although the Committee acknowledged the importance of "the need for finality and certainty in the sentencing process," it added that "justice cannot be considered served until full restitution is made."  Id. at 20.[17] The Committee did not relate the 90-day requirement to the interests of defendants, stating that the "sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information."  Id.  See United States v. Zakhary, 357 F.3d 186, 191 (2d Cir. 2004) ("As this court has now twice explained, the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect

---

[16] The conference managers of the final version of AEDPA directed that S. Rep. 104-179 "should serve as the legislative history for [the MVRA]."  H.R. Conf. Rep. 104-518, at 112 (1996), reprinted in 1996 U.S.C.C.A.N. 944, 945.  At the time of S. Rep. 104-179, the text that would become 18 U.S.C. § 3664(d)(5) was in substantially final form and included the 90-day period.

[17] The committee also noted its desire "that defendants not be able to fraudulently transfer assets that might be available for restitution," id., although it did not tie this concern specifically to the 90-day rule.

defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets."). The Seventh Circuit has also emphasized that the MVRA's "intended beneficiaries are the victims, not the victimizers." United States v. Grimes, 173 F.3d 634, 639 (7th Cir. 1999).

Cheal's timing argument would abrogate an obligation to pay more than $2 million in restitution to thousands of defrauded investors. On the facts here, such an outcome would be antithetical to the purpose of the MVRA. Moreover, a finding of plain error in Cheal's favor would turn the plain-error doctrine on its head by "seriously impair[ing] the fairness, integrity, or public reputation of the judicial proceedings." Duarte, 246 F.3d at 60. See Johnson v. United States, 520 U.S. 461, 470 (1997) ("Indeed, it would be the reversal of a conviction such as this which would have that effect.") We will not countenance such a result.[18]

---

[18] It is also important to understand the difficult circumstances confronting the district court and the government in a case such as this. In truth, § 3664's one-size-fits-all 90-day deadline seems poorly suited for complex cases involving thousands of victims and millions of dollars in losses. Other courts of appeals have offered advice on how to comply with § 3664's time limits and still render a complete and accurate accounting of the defendant's misconduct. The Eleventh Circuit, for example, has suggested that if district courts foresee a problem with getting the restitution order entered within 90 days of sentencing, they "can postpone sentencing and thereby put off the start of the 90-day period." United States v. Maung, 267 F.3d 1113, 1121 (11th Cir. 2001). We note this suggestion without expressing an opinion

## 2. *Notice to Cheal's Trial Counsel*

As noted, the court entered judgment in this case on February 25, 2003. Cheal filed her notice of appeal from that judgment on March 4, 2003. On April 4, she filed a pro se motion in this Court for new counsel. We issued an order on April 10, 2003, allowing her trial counsel to withdraw and appointing new appellate counsel, even though Cheal's restitution order was still pending in the district court and she continued to need the services of her trial counsel. Although Cheal's motion asked for counsel to be appointed for her appeal and "for whatever else is necessary at this time," our order requiring trial counsel to forward the case record to new appellate counsel by April 24 implies that we thought the proceedings in the district court were finished.

Meanwhile, both the district court and the government seemed unaware of the change in counsel that we had approved. When the government finished preparing its memorandum identifying Cheal's victims and their losses, it sent the memo to Cheal's trial counsel, whom we had allowed to withdraw a month and a half before. When the district court entered an amended judgment a month after receiving the government's memo, it also listed Cheal's trial counsel on its order and wrote that "[n]o opposition to these numbers and amount has been filed."

Cheal argues that she filed no opposition because the failure

on it.

-31-

of coordination between the district court and our court on the important matter of which attorney represented her meant that her attorney never received notice of the pending restitution order. Regrettably, it appears that there was uncertainty among everyone involved -- former trial counsel, new appellate counsel, the government, and the district and appellate courts -- over the question of Cheal's legal representation in the still incomplete restitution proceedings. This uncertainty lends force to Cheal's claim that she never received proper notice of the pending restitution order. The absence of such notice is a serious matter. However, even after the five-and-a-half months between the court's entry of its restitution order and the filing of Cheal's brief on appeal (from June 27 to December 12, 2003), Cheal's brief does not contain even a bare-bones assertion that she disputes anything in the restitution order. She merely asserts that she is entitled to an evidentiary hearing because she did not get one before.

Cheal's due process claim cannot succeed without at least some showing of the challenge she would mount to the restitution order. See United States v. Luciano-Mosquera, 63 F.3d 1142, 1158 (1st Cir. 1995) ("[t]he defendant must show prejudice" to prove that his right to due process was violated when a court reporter's failure to provide transcripts delayed processing of his appeal); see also United States v. Lovasco, 431 U.S. 783, 790 (1977) ("[P]roof of prejudice is generally a necessary but not sufficient element of a

due process claim . . . .") Cheal has not made even a minimal showing of the challenge to restitution that she would make at an evidentiary hearing. Under these circumstances, despite the regrettable problems with notice of the proposed restitution order, we must reject her due process claim.

However, we must add an explanatory note about future cases, like this one, involving deferred restitution orders at the time that a defendant files a notice of appeal from the entry of judgment. There might be a question whether the judgment of conviction entered on February 25, 2003, which imposed Cheal's sentence but only ordered restitution in general terms, was a final judgment that triggered the running of the appeal period. Arguably, the judgment was not truly final until June 27, 2003, when the district court issued an Amended Judgment and Order requiring Cheal to make restitution in the amounts and to the victims specified in the government's list. Despite these plausible arguments, we must treat the February judgment as final and appealable because of a statutory provision in the MVRA.

18 U.S.C. § 3664(o) provides: "A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that such a sentence can subsequently be corrected . . .; appealed and modified . . .; amended under subsection (d)(5); or adjusted . . . ." As we have already mentioned, subsection (d)(5) addresses itself to two situations that may require changes to a restitution

order.   First, where the victim's losses cannot be determined before sentencing, it provides an extra 90 days for a "final determination."  Second, where the "final determination" has failed to account for some victims who did not discover their losses until later, subsection (d)(5) provides such victims "60 days after discovery of those losses in which to petition the court for an amended restitution order."   18 U.S.C. § 3664(d)(5).   Section 3664(o)'s instruction, then, to disregard for purposes of finality restitution orders "*amended* under subsection (d)(5)" could be read narrowly as encompassing only the second situation, which specifically provides for "an *amended* restitution order."

However, we decline to read § 3664(o) so narrowly.   The provision states that courts should treat a "sentence that imposes an order of restitution" as final, notwithstanding the possibility of subsequent modification.  In Cheal's case, the February judgment imposed a restitution obligation.   The court stated in the judgment: "The defendant shall pay the balance of the restitution according to a court-ordered repayment schedule."   Although the specific amounts of restitution and the list of victims were yet to be determined, an "order of restitution" (the phrase used in § 3664(o)) had been entered.   Sensibly and properly, the court advised Cheal of her right to appeal from the sentence that it had just imposed: "You are advised, Ms. Cheal, that you have the right [to] appeal from the sentence by filing a notice of appeal.  I ask

Mr. Murray to talk with you about this and file such a notice within ten days if you decide to appeal."

A contrary rule -- one that linked the finality of the judgment of conviction to a later restitution order that included specific amounts and victims -- would have troubling consequences for defendants, who have an obvious and legitimate interest in pursuing a timely appeal. This interest would be compromised if the judgment of conviction were not final until the final restitution determination was reflected in an order of the court. Indeed, a defendant could already be incarcerated without the ability to pursue an appeal until the specifics of restitution are later determined. For these reasons of statutory language and policy, we conclude that the February judgment was one that "impose[d] an order of restitution" on Cheal within the meaning of § 3664(o) and was final and appealable.[19]

However, this conclusion raises a question as to whether Cheal's notice of appeal from the February judgment, filed pro se on March 4, 2003, served to bring before us the Amended Judgment and Order of June 27, 2003, which specified the restitution amounts owed to identified victims. Fed. R. App. P. 3(c)(1)(B) provides that the notice of appeal must "designate the judgment, order, or

---

[19] United States v. Kapelushnik, 306 F.3d 1090 (11th Cir. 2002), by contrast, takes the opposite view that a notice of appeal is premature if filed before final determination of restitution. Id. at 1093-94. We also disagree with that court's interpretation of § 3664's 90-day period as jurisdictional. See id.

part thereof being appealed."  The defendant must file the notice of appeal within ten days after the entry of judgment or the order being appealed.  See Fed. R. App. P. 4(b).  Typically, these rules prevent a court of appeals from considering any orders or judgments besides those designated in the appellant's notice of appeal.  In the case of an amended judgment or a later order that is substantively different, an appellant may have to amend his notice of appeal or file a new one.  "The settled rule is that the non-substantive revision of a previously entered judgment does not restart or otherwise affect the period within which appellate review must be sought.  It is only when the judgment-issuing court alters matters of substance or resolves some genuine ambiguity that the entry of an amended judgment winds the appeals clock anew."  Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 223 n.2 (1st Cir. 1994) (internal citations omitted).[20]  Cheal's March 4 notice of appeal stated in full: "Notice is hereby

---

[20] The same rule applies in criminal cases.  See United States v. Rapoport, 159 F.3d 1, 3 n.4 (1st Cir. 1998).  The guide in such situations remains Federal Trade Commission v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206 (1952), which cautioned that

> the mere fact that a judgment previously entered has been reentered or revised in an immaterial way does not toll the time within which review must be sought. Only when the lower court changes matters of substance, or resolves a genuine ambiguity, in a judgment previously rendered should the period within which an appeal must be taken or a petition for certiorari filed begin to run anew. The test is a practical one.

Id. at  211-212.

given that Nancy Cheal in the above named case hereby appeals to the United States Court of Appeals for the 6th [sic] Circuit from a judgment and sentence entered in this action on the 20th [sic] day of February, 2003."[21] Arguably, she should have filed a second notice of appeal from the Amended Judgment and Order of restitution of June 27, 2003. Indeed, looking to the future, we think that, as a general proposition, a deferred restitution order entered pursuant to § 3664(d)(5), subsequent to a final judgment of conviction which has already been appealed, should be the subject of a second notice of appeal.[22]

In this case, however, we consider the adequacy of Cheal's March 4 notice of appeal in light of general principles that "encourage us to construe notices of appeal liberally and examine them in the context of the record as a whole." Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 3 (1st Cir. 2002); see also Blockel v. J.C. Penney Co., Inc., 337 F.3d 17, 23-4 (1st Cir. 2003). The core purpose of a notice of appeal is to "facilitate a proper decision on the merits." Foman v. Davis, 371 U.S. 178, 182

---

[21] Despite the reference to the Sixth Circuit, Cheal in fact sent her notice to the clerk of this Court, as well as the district court and counsel.

[22] See, e.g., United States v. Ferrario-Pozzi, 368 F.3d 5, 7-8 (1st Cir. 2004) (defendant filed first notice of appeal from entry of judgment and second from preliminary order of forfeiture); In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 19 (1st Cir. 2003) (corporation filed first notice of appeal from order to produce documents and second from citation of contempt for failure to produce them).

(1962).[23]  Cheal's notice of appeal was sufficiently clear in its intent to challenge all elements of her conviction and sentence, which, as we have noted, imposed a general restitution obligation. There is also no question here of surprise or prejudice to the government.  See United States v. Winn, 948 F.2d 145, 154-55 (5th Cir. 1991) (treating a pre-judgment notice of appeal as effective, where the defendant's intent to appeal ruling was clear and the government was not prejudiced or misled).  Both sides fully briefed the restitution issues on appeal.  Therefore, on the facts here, we conclude that Cheal's notice of appeal filed on March 4, 2003, served to bring the restitution order of June 27, 2003, before us for appellate consideration.

3. *Considering Cheal's Ability To Pay When Ordering Restitution*

Cheal argues, citing United States v. Haddock, 50 F.3d 835 (10th Cir. 1995), that the district court erred by not reviewing her financial resources before deciding whether to order restitution and in what amount.  Haddock, decided the year before Congress passed the MVRA, interpreted the MVRA's predecessor statute, the Victim and Witness Protection Act of 1982, Pub. L. 97-291, 96 Stat. 1248.  The MVRA gives the court no discretion in ordering restitution in cases of fraud, see 18 U.S.C. §

---

[23] For example, we overlook the fact that her notice of appeal expressed a determination to appeal to the Sixth Circuit, despite Rule 3's requirement that the notice "name the court to which the appeal is taken."  Fed. R. App. P. 3(c)(1)(C).

3663A(c)(1), or in calculating the amount of restitution owed:

> In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

Id. § 3664(f)(1)(A). See United States v. Chay, 281 F.3d 682, 686 (7th Cir. 2002) (noting that the MVRA "prohibits the court from examining the defendant's ability to pay restitution"); United States v. McGlothlin, 249 F.3d 783, 784 (8th Cir. 2001) (same); United States v. Alalade, 204 F.3d 536 (4th Cir. 2000) (same); United States v. Myers, 198 F.3d 160, 168-69 (5th Cir. 1999) (same); United States v. Coates, 178 F.3d 681, 683 (3d Cir. 1999) (same).

The court may take a defendant's financial resources into account only insofar as they affect "the manner in which, and the schedule according to which, the restitution is to be paid . . . ." Id. § 3664(f)(2). Cheal did not object below to the repayment plan, and she does not do so now. In any event, § 3664(k) requires her to notify the court of "any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution." This provision accounts both for windfalls and for tighter times. Cheal remains subject to its strictures.

**Affirmed**.

-39-