**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

STEVEN CRAIG MORELAND,
            *Defendant-Appellant.*

No. 05-30541

D.C. No.
CR-01-00108-05-
BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted May 9, 2007
Submission Withdrawn May 25, 2007
Resubmitted December 5, 2007
Seattle, Washington

Filed December 12, 2007

Before: Procter Hug, Jr., M. Margaret McKeown, and
William Fletcher, Circuit Judges.

Opinion by Judge Hug

## COUNSEL

Jordan Gross, Yarmuth Wilsdon Calfo PLLC, Seattle, Washington, for the defendant-appellant.

Andrew C. Friedman, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

## OPINION

HUG, Circuit Judge:

For his participation in a fraudulent pyramid scheme, defendant-appellant Steven Moreland was convicted of mail and wire fraud, money laundering, and conspiracy to commit mail and wire fraud and money laundering. On remand, the district court imposed a revised sentence of 18 years in prison and ordered Moreland to pay restitution to the victims in the amount of slightly over $36 million. Moreland appeals his conviction on the grounds that he involuntarily waived his right to counsel and received ineffective assistance of counsel, the district court erred in not granting an adequate continuance, the prosecution committed misconduct resulting in a violation of his due process rights, and insufficiency of the evidence. Moreland also appeals his sentence on the basis that it is unreasonable under 18 U.S.C. § 3553(a). Finally, Moreland appeals the imposition of restitution because the district court failed to comply with the time frame outlined in § 3664(d)(5) of the Mandatory Victims Restitution Act. We find that none of Moreland's arguments warrants reversal and, thus, we affirm.

## I.

Moreland participated in an enormous pyramid scheme that, from November 1997 until May 2000, swindled approximately 2,500 people out of more than $73 million. Many of the victims in this case were of retirement age and invested much or all of their savings in the scheme, which promised astronomical returns. In reality, Moreland and his associates were conducting a massive fraud in which a portion of the funds from later investors were used to pay the promised returns of some earlier investors. Most earlier investors were convinced to roll their fictional returns over into supposed new investment opportunities. The funds not used to repay earlier investors were paid to the operators of the scheme or squandered on unsound financial misadventures.

The federal government finally shut down the scheme on May 10, 2000, by executing search warrants at the home of John Wayne Zidar, the mastermind and leader of the scheme, and the business offices in Washington and Arizona from which the scheme was conducted. On the day of the searches, Moreland fled with his family to Costa Rica, where he planned to stay in order to avoid capture. Although his wife refused to stay in Costa Rica, necessitating his return to the United States, Moreland went back to Costa Rica in August 2000. He took with him all of his documents relating to the scheme in order to prevent the government from obtaining the records. After supposedly discovering the fraudulent nature of the enterprise for the first time while in Costa Rica, Moreland continued transferring money from accounts containing victims' investment funds into his own accounts to pay his salary and personal expenses.

Moreland and his associates were indicted on March 28, 2001. Moreland eventually surrendered on April 3, 2001, in Tyler, Texas, at which time he was arrested. While driving from Dallas to Tyler to surrender, Moreland stopped about half way between in the town of Canton and discarded his

laptop computer in a dumpster behind a Dairy Queen near the highway.

At his initial appearance in the Western District of Washington on April 20, 2001, Moreland indicated his desire to represent himself. Upon the prosecution's motion, a magistrate judge conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), on April 26 to determine whether Moreland should be permitted to waive his right to counsel. The magistrate judge permitted Moreland to represent himself but concluded that standby counsel should assist him. Ralph Hurvitz was then appointed to facilitate Moreland's defense. The district judge conducted a second *Faretta* hearing on June 5, at the request of the prosecution, at which time she urged Moreland not to represent himself. Nonetheless, the district judge concluded that Moreland had knowingly and intelligently waived his right to counsel and permitted him to continue representing himself. The district judge further directed Hurvitz to continue acting as standby counsel.

In a second superceding indictment issued on January 8, 2002, Moreland was charged with ten counts of mail fraud in violation of 18 U.S.C. § 1341, six counts of wire fraud in violation of 18 U.S.C. § 1343, four counts of promotion money laundering in violation of 18 U.S.C. § 1956(a)(1), four counts of concealment money laundering involving foreign transfers in violation of 18 U.S.C. § 1956(a)(2), conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The second superceding indictment also contained a criminal forfeiture count relating to numerous items of both real and personal property in the possession of the defendants as well as funds seized from bank accounts in the United States, Samoa, Costa Rica, and the Bahamas.

On April 23, 2002, Moreland filed a motion to have a lawyer appointed to represent him. The district court held a hearing on the motion on May 6, 2002, and Hurvitz was appointed

to represent him because of his familiarity with the case. The trial was set for June 10, 2002. Hurvitz stated that he wanted additional time to prepare, but Moreland opposed a continuance. The district court granted a continuance of two weeks until June 24, 2002. Hurvitz served as Moreland's counsel during the trial.

On August 14, 2002, after a 34-day trial, a jury found Moreland guilty on three counts of mail fraud, three counts of wire fraud, two counts of promotion money laundering, four counts of concealment money laundering involving foreign transfers, and both conspiracy charges. Zidar was also found guilty on all 25 counts on which he was charged and sentenced to 30 years in prison. *United States v. Zidar*, 178 Fed. Appx. 673, *1 (9th Cir. 2006)

In determining Moreland's sentence, the district court adopted the Sentencing Guidelines calculation set forth in the original Presentence Report. Accordingly, the district court began with a base offense level of 43 and criminal history category I, which resulted in a sentence range of life imprisonment. The district court departed downward three points due to Moreland's mental state, resulting in a base offense level of 40 and a criminal history category of I. The applicable sentence range, under the 1998 edition[1] of the U.S. Sentencing Commission Guidelines Manual, was 292-365 months in prison. The district court sentenced Moreland to 292 months in prison, the bottom of the sentencing range, on August 22, 2003. At the prosecution's request, the district court also deferred the issue of restitution pending a determination by a receiver in a related civil case, brought by the U.S. Securities and Exchange Commission, of the identities of victims and the amounts of their losses. The district court's order explicitly stated that it would "enter a subsequent order identifying the payees and the amount of restitution owed to each payee."

---

[1]The 1998 edition was used to avoid a possible violation of the *ex post facto* clause.

Moreland did not object to the district court's deferral of the restitution determination.

Moreland then appealed his conviction and sentence, but not the district court's deferral of restitution, to this court. Following the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), a prior panel of this court remanded for resentencing under the now-advisory Sentencing Guidelines on December 14, 2004. The remand order did not address the substantive issues raised in Moreland's appeal.

On remand, the district court ordered the preparation of a Revised Presentence Report. In March 2005, while the Revised Presentence Report was being prepared, the receiver completed its task of identifying victims and the amounts of their losses. The government then submitted its Revised Presentence Report on November 1, 2005. The Revised Presentence Report, which contained the list of victims and losses, recommended that the district court adopt the same Sentencing Guidelines calculation as in the original sentence and order restitution in the amount of $36,031,772.84 pursuant to 18 U.S.C. § 3663A.

The district court held a sentencing hearing on November 7, 2005, at which time the district court adopted the Sentencing Guidelines range recommended in the Revised Presentence Report and found by clear and convincing evidence the factors on which the recommendation was based. In light of *United States v. Booker*, 543 U.S. 220 (2005), the district court examined the sentencing factors listed in 18 U.S.C. § 3553(a) and reduced Moreland's sentence to 216 months (18 years) in prison. The district court also imposed $36,031,772.84 in restitution. Moreland appealed his conviction as well as the revised sentence and restitution order on November 10, 2005.

II.

Moreland appeals his conviction by alleging denial of his right to counsel, ineffective assistance of counsel, improper

failure of the district court to grant a continuance, prosecu-torial misconduct, and insufficiency of the evidence.

A.

[1] First, Moreland argues that he involuntarily waived his right to counsel. The Sixth Amendment of the U.S. Constitu-tion guarantees that a person brought to trial in federal court "must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta*, 422 U.S. at 807. A criminal defendant may waive the right to counsel and represent himself. *Id.* at 819-20. When a defendant requests to proceed pro se, a district court may only grant the request after determining that the defendant "know-ingly and intelligently" waived the right to counsel. *Id.* at 835. Once a district court has determined that a defendant's waiver of his right to counsel is knowing and intelligent, it may appoint standby or "advisory" counsel to assist the pro se defendant without infringing on his right to self-representation. *McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984). At the same time, a defendant who waives his right to counsel does not have a right to advisory counsel. *United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996); *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994). Generally, the role of standby counsel is vague and undefined, and the defendant must retain control over his case. *Mc-Kaskle*, 465 U.S. at 177-78.

The district court conducted two separate Faretta hearings in this case and, after each hearing, concluded that More-land's requested waiver was both knowing and intelligent. The district court also appointed standby counsel to assist Moreland. Moreland argues on appeal, however, that his waiver of his right to counsel was conditioned on assurances from the district court regarding the level of assistance he could expect to receive from standby counsel. Those assur-ances were not satisfied, according to Moreland, because standby counsel did not provide as much assistance as More-

land expected. For that reason, Moreland argues that his waiver of his right to counsel was not voluntary.[2]

The validity of a Faretta waiver is a mixed question of law and fact reviewed de novo. *United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004).

**[2]** The record undermines Moreland's assertion that his waiver was conditioned on specific assurances from the district court regarding the level of participation he could expect from standby counsel. During the second *Faretta* hearing, which the prosecution requested after learning that Moreland was receiving assistance with his case from Donald Mueller, a former co-participant in the pyramid scheme who was not licensed to practice law and who was scheduled to appear as a witness on Moreland's behalf, the district judge engaged in a lengthy discussion with Moreland, ensuring that he understood the charges against him and the disadvantages of representing himself. Indeed, the district judge "strongly urge[d]" Moreland to obtain counsel. Nevertheless, Moreland insisted on representing himself. The district judge concluded that his waiver was voluntary and directed Hurvitz to continue serving as standby counsel. In continuing Hurvitz's participation as standby counsel, the district judge did not promise any specific degree of assistance. Rather, the district judge explicitly noted that the role of standby counsel was undefined. As the

---

[2]Moreland relies on *Milton v. Morris*, 767 F.2d 1443 (9th Cir. 1985), for the proposition that a defendant who waives his right to counsel based on an understanding that he will have assistance with his pro se defense has not knowingly and intelligently waived his right to counsel under Faretta. The two cases are not similar. In *Milton*, the district court and prison officials blocked the defendant's access to legal materials, telephone use, investigators, couriers, and witness. *Id.* at 1444-45. Here, Moreland had more than ample access to the means necessary to prepare his defense. Moreover, Moreland received assistance from standby counsel, just not the degree of assistance he later decided he wanted. Additionally, the district court repeatedly advised Moreland to withdraw his waiver and request representation, but he refused to do so. When Moreland eventually did withdraw his waiver, the district court appointed counsel.

district judge explained: "So his position in this case to a large extent is determined by your position in the case. . . . It's hard to tell now what's going to happen. Cases develop often with a life of their own. . . . But what his role is to a large extent will be determined on how you use him." The district judge went on to make clear that Moreland and Hurvitz would have to "play this by ear." That explanation of the role of standby counsel was not specific. Thus, contrary to Moreland's contention, the district court made no assurances upon which he could have reasonably conditioned his waiver of counsel.

Furthermore, if Moreland did not believe that standby counsel was living up to his expectations, he had ample opportunity to waive his right to self-representation and request the district court to appoint full counsel. In fact, after the second Faretta hearing, Moreland began complaining about Hurvitz's representation almost immediately. Among other things, Moreland accused Hurvitz of refusing to familiarize himself with the case, review the evidence, assist with discovery, and "offer any assistance beyond filing a few motions." In September 2001, Moreland requested to have Hurvitz replaced by "non-representational counsel"—that is, Mueller. The district judge denied Moreland's request, stating that although the role of standby counsel is "vague and undefined, the court instructed Hurvitz to fill that role as appropriately as possible under the circumstances." The district judge further stated that "it was the court's understanding during the *Faretta* hearing that Moreland expected little more from Hurvitz than fulfillment of basic administrative responsibilities." The district judge further explained that "based on representations from Moreland that he wishes to represent himself, Hurvitz is prohibited from contributing beyond a basic level to Moreland's case, for risk of encroaching on Moreland's *Faretta* rights." The district court went on to state that "Moreland is requesting, and Hurvitz is resisting, more participation than courts creating the standby counsel role anticipated." Consequently, the district court clearly informed Moreland well in advance of trial what he could and could not expect

from standby counsel. If Moreland's waiver of his right to counsel was truly conditioned on his expectation that Hurvitz would play a larger role in his defense, he could have withdrawn his waiver and asked the district court to appoint full counsel at that time. He did not do so.

Instead of waiving his right to self-representation, Moreland filed additional pleadings in October and December 2001, in which he suggested that the district court was unlawfully preventing Mueller from representing him. The district court again admonished Moreland that Mueller would not be permitted to represent him. The district court also informed Moreland that, unless he was willing to allow Hurvitz to represent him, he was not entitled to greater assistance than Hurvitz was already providing. Again, Moreland declined to waive his right to self-representation and have full counsel appointed. Despite Moreland's ostensible disappointment with Hurvitz's performance as standby counsel, Moreland did not withdraw his waiver and request that counsel be appointed to represent him until April 23, 2002.

**[3]** At no point did the district court lead Moreland to believe that he would receive substantial assistance with his case from standby counsel. Thus, Moreland's waiver of his right to counsel was knowing and intelligent.

B.

**[4]** Second, Moreland claims that he was denied effective assistance of counsel. "[A]s a general rule, we do not review challenges to the effectiveness of defense counsel on direct appeal." *United States v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005). Rather, we prefer to review ineffective assistance of counsel claims in habeas corpus proceedings under 28 U.S.C. § 2255. *United States v. Alferahin*, 433 F.3d 1148, 1160 n.6 (9th Cir. 2006). We may consider such claims on direct appeal, however, where "the record on appeal is sufficiently developed to permit determination of the issue." *Id.*

**[5]** In this appeal, Moreland makes four arguments in support of his ineffective-assistance-of-counsel claim: (1) trial counsel failed to investigate Moreland's mental health, (2) trial counsel failed to request an adequate continuance, (3) trial counsel failed to object to the district court's limitation of Moreland's direct examination, and (4) trial counsel failed to object to questions regarding the veracity of witnesses on cross-examination and to the prosecution's statements during closing arguments regarding Moreland's veracity. But the record is not sufficiently developed to permit determination of the issues. For example, defense counsel has not had an opportunity to explain his actions. *See United States v. Laughlin*, 933 F.2d 786, 789 (9th Cir. 1991). The record is also undeveloped with regard to Moreland's purported mental health defense, as the government has not conducted its own psychological evaluation. Without that evaluation, we are unable to determine whether prejudice resulted from trial counsel's failure to investigate. *Id.* Accordingly, we decline to consider Moreland's ineffective assistance of counsel claims on direct appeal, but he may pursue those claims in collateral proceedings. *Jeronimo*, 398 F.3d at 1156.

C.

Third, Moreland contends that the district court erred in failing to grant an adequate continuance. Here, the district court granted a two-week continuance over Moreland's objection. But Moreland argues that the district court should have sua sponte granted a lengthier continuance to allow his trial counsel adequate time to prepare. A district court's decision to grant or deny a continuance is reviewed for abuse of discretion, even where a defendant fails to make a formal motion for a continuance. *United States v. Nguyen*, 262 F.3d 998, 1002 (9th Cir. 2001). There is no abuse of discretion unless the denial was "arbitrary or unreasonable." *United States v. Wills*, 88 F.3d 704, 711 (9th Cir. 1996).

**[6]** The district court did not abuse its discretion in granting only a two-week continuance, however, because the need for

a continuance was Moreland's fault. *See United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir. 1994). The district court repeatedly advised Moreland to withdraw his waiver of counsel and accept representation. For example, the district judge told Moreland "[i]f you exclude Mr. Hurvitz early on, then turn to him later, he's going to be severely handicapped, in ways he wouldn't be if he were your attorney right from the beginning." But Moreland insisted on relying on Mueller, a co-participant in the criminal enterprise and an unlicensed lawyer, as legal counsel. Moreland did not request representation until two months before trial. When Moreland finally did accept counsel, he opposed his trial counsel's expressed desire for a continuance and prevented trial counsel from requesting more time to prepare. He even opposed the two-week continuance granted sua sponte by the district court. Consequently, Moreland was clearly to blame both for the delay and for the district court not granting a longer continuance. The district court's decision to grant only a two-week continuance, when Moreland objected to any continuance, was not "arbitrary or unreasonable;" therefore, the district court did not abuse its discretion.

### D.

Fourth, Moreland argues that his due process rights were violated because the government committed prosecutorial misconduct by questioning Moreland about the veracity of two prosecution witnesses during cross-examination and by casting doubt upon Moreland's veracity during closing arguments. Moreland did not object at trial. "We review claims of prosecutorial misconduct for plain error when a defendant failed to object at trial." *United States v. Washington*, 462 F.3d 1124, 1136 (9th Cir. 2006); *see* Fed. R. Crim. P. 52(b). Under the plain error standard, relief is not warranted unless there has been: (1) "error," (2) that was "plain," (3) that affected "substantial rights," and (4) that "seriously affected the fairness, integrity, or public reputation of the judicial pro-

ceedings." *United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004).

1.

**[7]** Moreland first asserts that his due process rights were violated when the prosecution compelled him to testify regarding whether two government witnesses lied during their testimony. It is improper for a prosecutor to question a defendant regarding the veracity of a government witness. *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004); *see also United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998) (holding that testimony regarding witness' credibility is prohibited unless it is admissible as character evidence). In this case, the prosecutor twice asked Moreland about the veracity of government witnesses during his cross-examination. The first instance involved Juan Alvarez, a Costa Rican attorney with whom Moreland left all of his documentation regarding the criminal enterprise. Alvarez testified that he never had an attorney-client relationship with Moreland, whereas Moreland claimed Alvarez was his lawyer. The prosecutor asked Moreland to testify regarding Alvarez's veracity on this point:

> Q.  You're telling us he was your lawyer?
>
> A.  Yes, he was.
>
> Q.  You heard his testimony. He said he had no client relationship with you.
>
> A.  That was his testimony.
>
> Q.  He's lying?
>
> A.  I don't know why he would be, but he has to be.
>
> Q.  So he's a liar. Right?

A.  I don't know why, but yes.

The second instance involved Lisa Green, a former administrative assistant who testified about statements Moreland made concerning the ownership of a house in Texas and whether Moreland paid his personal expenses with money from a trust set up with investor funds. She also testified that Moreland had lied to investors about his health. The prosecution's questioning of Moreland transpired as follows:

Q.  Lisa Green told us you had that checkbook in your house?

A.  Yes, sir, she did.

Q.  And she told us that you would sign Jeff Lewis and Derral Hineman's names to those checks. Remember her testimony?

A.  That's what her testimony was. That is not true.

Q.  She's lying?

A.  I just was never allowed to sign their signatures. There was no reason to.

Q.  When she told this jury she saw you signing Jeff Lewis's name, she's lying. Right, Mr. Moreland?

A.  No. I think she could have been mistaken. . . .

. . .

Q.  You told Ms. Green that this house was your house, didn't you?

A.  No, sir, I did not.

Q.  So she's lying about that?

A.  You know, people jump to conclusions . . . .

Q.  If Ms. Green said you told her this was your house, was she lying about that?

A.  Yes, sir, she would be. I've never had a discussion with her like that.

Q.  Why do you think she would come in here and lie under oath about you?

A.  Well, probably because I fired her.

. . .

Q.  So if [Ms. Green] said you were healthy, she's lying.

A.  You're trying to twist something here of what is this sabbatical.

The prosecutor's questioning is clearly improper under our case law. In *United States v. Geston*, 299 F.3d 1130 (9th Cir. 2002), a case involving the prosecution of a police officer for unreasonable use of force, we held that a prosecutor's questioning of two law enforcement officers during cross-examination improperly compelled the witnesses to offer opinions regarding the veracity of government witnesses. *Id.* at 1136-37. When cross-examining two defense witnesses, the prosecution in *Geston* summarized prior government witness testimony that contradicted each defense witness's testimony, and then asked whether the defense witness thought the government witness was lying. *Id.* at 1135-36. We held this type of questioning to be improper. *Id.* at 1136. Similarly, in *Combs*, we found that the prosecution improperly questioned the defendant regarding whether a government agent lied dur-

ing his testimony. 379 F.3d at 572. The questioning in this case also resembles the questioning in *United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999), in which we held that compelling a defendant to call a government agent a liar was improper. *Id.* at 1220. The following constituted the line of questioning deemed improper in *Sanchez*:

> Q.   You heard Deputy Marshal Fielder testify this morning?
>
> A.   Yes, I did.
>
> Q.   You were telling the ladies and gentlemen of the Jury that he lied to them?
>
> A.   Yes, I did.
>
> Q.   That is what you are saying, he lied this morning?

*Id.* at 1219. The questioning in this case is not only similar in nature to that in *Sanchez*, it is lengthier and more accusatory. Therefore, the prosecutor's cross-examination of Moreland was improper.

The government argues, however, that the prosecutor's questions regarding Green and Alvarez were proper because Moreland "invited" questions regarding their veracity. According to the government, Moreland opened the door to the issue of Green's credibility by stating "That's what her testimony was. That is not true." The government seems to suggest that the prosecution had no choice but to follow up Moreland's statement by asking whether Green was lying.[3] This argument makes little sense on its own, especially when compared to the questioning in *Sanchez*, and becomes com-

---

[3]The government offers no specific rationale to support its argument that Moreland "invited" testimony regarding Alvarez's veracity.

pletely invalid when considering the entire line of questioning. The prosecutor asked whether Moreland considered Green a liar six times. Moreland tried to explain that Green was not a liar four times, but the prosecutor persisted with questions regarding her veracity. Consequently, the government cannot plausibly claim that its questions about Green's truthfulness were "invited."

**[8]** Even though the prosecution's questioning was improper, it does not amount to plain error. "A prosecutor's improper questioning is not in and of itself sufficient to warrant reversal. It must also be determined whether the prosecutor's actions 'seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice.' " *Geston*, 299 F.3d at 1136 (quoting *United States v. Tanh Huu Lam*, 251 F.3d 852, 862 (9th Cir. 2001) (citation omitted), and citing *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998)). Moreland argues that the prosecutor's questions prejudiced his defense and affected the integrity of his trial because Moreland's knowledge and intent were the main issues at trial and credibility of the witnesses was central to the prosecution's case. As the government points out, the prosecution presented more than 75 witnesses in this case. Furthermore, Green and Alvarez were peripheral witnesses because they testified regarding matters of minor importance to the case. In fact, Moreland himself admits that an IRS agent was the prosecution's key witness. In the context of this long and complicated trial, in which witness credibility was not paramount, the prosecution's questioning of Moreland regarding those two non-essential witnesses did not prejudice his defense, affect his substantial rights, or diminish the integrity of the judicial proceedings.

2.

**[9]** Moreland next argues that his due process rights were violated by the prosecution's statements during closing argu-

ments regarding Moreland's veracity. As a general rule, "a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of [government] witnesses." *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985). This concept has been extended to find that referring to a defendant as "a liar" during closing argument, when that assertion is not based on "reasonable inferences," is improper. *See United States v. Garcia-Guizar*, 160 F.3d 511, 520 (9th Cir. 1998). At the same time, we have recognized that "the prosecution must have reasonable latitude to fashion closing arguments." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). As a result, it is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984). Indeed, we have found that, in "instances of flatly contradictory testimony on important issues . . . it [is] proper for the government to argue that the jury ought not to believe the [defendant's] version." *Molina*, 934 F.2d at 1445. Thus, the prosecution may refer to a defendant as a liar if it is "commenting on the evidence and asking the jury to draw reasonable inferences." *Garcia-Guizar*, 160 F.3d at 520; *see also United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996) (holding that a prosecutor's use of the words "lie," "lies," or "lied" over 90 times when referring to the defendants in its closing argument was "within the boundaries of proper . . . summations.").

In this case, the prosecutor referred to Moreland as a liar several times throughout his closing argument. To illustrate, Moreland points to the following statement:

> Remember, I asked Mr. Moreland about [being a liar] on the witness stand. I said: Hey, if this jury finds that you lied, can they apply your own words to yourself and conclude that as to you, once a liar always a liar? And you saw the little cogs in his head spin. He didn't know quite what to say. He was in kind of a jam there. He paused, he delayed, and he

finally begrudgingly said: Yeah, they can conclude once a liar, always a liar. Make Mr. Moreland eat those words. And you can find so many lies he told. I'll tell you some of them. But when you go back in there, you can probably make a list of 50 lies he told.

. . .

So once you conclude Mr. Moreland is a liar, then nothing he told you is believable.

The prosecutor then went on to point out specific examples of contradictory testimony pointing to the conclusion that Moreland was not telling the truth. For example, the prosecutor specifically discussed Moreland's explanation of the investment scheme and how Moreland merged his enterprise with scheme mastermind Zidar's, Moreland's denial that the house he lived in was actually his, Moreland's denial that he threw his laptop into a dumpster, and whether Moreland knew of the government's search of Zidar's house when he fled to Costa Rica. The prosecution then went on to remind the jurors that it was their job to evaluate the credibility of the witnesses and defendants.

**[10]** This case is similar to *Molina*, in which the prosecutor explained how the defendant's testimony directly conflicted with that of a confidential informant and then stated that the defendant must have lied. 934 F.2d at 1445. In *Molina*, the defendant objected to the following passage from the prosecution's closing argument:

[Y]ou could only come to one conclusion: That somebody is lying. And who is that? Who's lying? *Is Special Agent Reyes lying?* Did he get up on the stand under oath and lie to you for the sole purpose of convicting an innocent man? *It's unbelievable.*

*The one who lied to you is the one who is guilty* of possessing with the intent to distribute the

cocaine. *And that's the defendant, Frank Molina.* And when you weigh the credibility of the witnesses, remember that there was one witness here who had a greater motive to lie than any other witness, a greater stake in this case than either Art Reyes or Alvaro or Agent Leppla or anybody, and that man was the defendant, Frank Molina. He had the greatest bias in this case and the greatest motive to lie.

So when you go back into the jury room remember . . . that *Mr. Molina lied to you on the stand and remember that the reason he lied to you is because he is guilty,* and that's the only reason and the only motivation for him to lie.

*Id.* (alterations in original) (emphasis in original). We found that "the inference is unavoidable that 'somebody is lying' " and that the prosecutor's statements were proper based on the evidence. *Id*. Similarly, the prosecutor's statements in this case were reasonable based on the evidence, which the prosecutor demonstrated by carefully walking the jury through the evidence and pointing out inconsistencies. Therefore, based on the case law, the prosecutor's statements regarding Moreland's credibility were not improper.

Moreover, the prosecutor's statement did not affect Moreland's substantial rights. Even if the prosecutor's statements were improper, Moreland must show that the statements affected the outcome of his trial. *United Stated v. Romero-Avila*, 210 F.3d 1017, 1022 (9th Cir. 2000). Where the government "presented strong independent evidence of [the defendant's] guilt," a prosecutor's improper statements about the defendant during cross-examination will not be found to have affected the defendant's substantial rights. *Id.* at 1023; *see also United States v. Laurins*, 857 F.2d 529, 539 (9th Cir. 1988) ("If the evidence was so strong that these remarks had no effect on the jury, reversal is not required."). Here, the government presented strong independent evidence that

Moreland knowingly engaged in a massive fraud. Additionally, the district court properly instructed the jury that "[a]rguments and statements by lawyers are not evidence" and what the lawyers said "in their closing arguments . . . is not evidence." As a result, Moreland has not shown that the prosecutor's statements during closing arguments affected the outcome of the proceedings. *See Sassounian v. Roe,* 230 F.3d 1097, 1106-07 (9th Cir. 2000).

**[11]** Moreland also objects to what he considers the prosecutor's misstatement of the law in its closing argument. Obviously, a "prosecutor should not misstate the law in closing argument." *United States v. Berry*, 627 F.2d 193, 200 (9th Cir. 1980). Moreland argues that the following statement by the prosecutor to the jury constituted a misstatement of the law governing the case:

> So when you're assessing credibility, look at who got up on that stand and answered questions straightforwardly, and look who tried to duck and weave. And once you conclude they're not credible, case is over.

But Moreland ignores the fact that the prosecutor spent a substantial amount of time reviewing the legal elements of the charges and discussing which facts the jury needed to find in order to convict Moreland. In doing so, the prosecutor accurately explained exactly what the government had to prove to find Moreland guilty. Consequently, the single, brief statement highlighted by Moreland is neither improper nor did it affect his substantial rights. "Put in proper context," the statement was an "isolated moment" in a 34-day trial. *See Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991). Moreland's due process rights were not violated.

E.

Fifth, Moreland challenges his conviction for money laundering and conspiracy to commit money laundering, arguing

the evidence submitted at trial was insufficient to support the jury's verdict. "Claims of insufficient evidence are reviewed de novo." *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004). There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Moreland was convicted of two counts of promotion money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Counts 26 and 27), four counts of concealment money laundering involving foreign transfers in violation of 18 U.S.C. § 1956(a)(2)(B)(i) (Counts 33-36), and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 38).

Regarding the two promotion counts (Counts 26 and 27), 18 U.S.C. § 1956(a)(1) makes it a crime to conduct a financial transaction "which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1) (A)(i). The counts on which Moreland was convicted involved transfers from accounts controlled by Meliorations Management Team ("Meliorations"), a trust established to collect funds from investors, to two sales agents with the purpose of paying their commissions. Moreland argues that only Zidar, Elizabeth Anne Phillips (the administrator for the enterprise), and Susan Fitzgerald (who filled in temporarily for Phillips) had access to the Meliorations accounts and that Phillips and Fitzgerald alone conducted wire transfers and paid sales agents' commissions. Additionally, Moreland argues that the prosecution offered no evidence that Moreland was involved in the transfers comprising the promotion counts. For those reasons, Moreland claims his conviction on the promotion counts should be vacated for lack of sufficient evidence.

Regarding the four concealment counts (Counts 33, 34, 35, and 36), 18 U.S.C. § 1956(a)(2) makes it a crime to transfer funds from the United States to a foreign country "knowing that the . . . funds involved . . . represent the proceeds of some form of unlawful activity and knowing that such . . . transfer is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(B)(i). The counts on which Moreland was convicted, Counts 33-36, involved transfers from Meliorations's account in Washington to three international business corporation ("IBC") accounts in Samoa and an IBC account in the Bahamas. One of the Samoan IBCs, Millennium, was controlled by Moreland. Yet Moreland argues that the testimony offered at trial by Phillips and Fitzgerald demonstrated that only Zidar, Phillips, Fitzgerald, and William Cravens (who established offshore accounts for the enterprise) were directly involved in those transactions. According to Moreland, the prosecution offered no evidence that Moreland was involved in the transfers comprising the concealment counts. Moreland argues, therefore, that his conviction is not supported by sufficient evidence.

[12] Moreland's claim regarding Count 34 is meritless. That count involved a wire transfer of $510,800 from Meliorations to Millennium, an IBC created and controlled by Moreland and used by him to pay his personal expenses. Phillips testified that this transfer was "for a trade" (i.e., an investment) and sent offshore to conceal it from the government. Not only did the prosecution produce evidence in support of Moreland's culpability on this count, Moreland virtually admitted as much in his brief to this court by quoting a portion of Fitzgerald's testimony in which she states that Moreland "was behind Millennium." A rational juror could have concluded that Moreland was therefore involved with the transfer. Consequently, the evidence is sufficient to uphold his conviction on Count 34.

**[13]** There is also sufficient evidence to uphold Moreland's convictions on the other money laundering charges, Counts 26, 27, 33, 35, and 36, even though those transactions did not directly involve Moreland. Under *Pinkerton v. United States*, 328 U.S. 640 (1946), a conspirator is "criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002) (citing *Pinkerton*, 328 U.S. at 645-48). Pursuant to the *Pinkerton* doctrine, sufficient evidence exists in this case to uphold Moreland's convictions for the substantive money laundering charges provided that: (1) there is sufficient evidence to uphold his conviction for conspiracy, (2) the money laundering offenses were committed in furtherance of the conspiracy while Moreland was a member of the conspiracy, and (3) the actions providing the basis for the substantive charges were reasonably foreseeable to Moreland.[4] *Pinkerton,* 328 U.S. at 645-48.

**[14]** Section 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Moreland argues that he did not have knowledge of the objective of Zidar's money laundering conspiracy. "Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction." *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987). In asserting that he had no knowledge of the conspiracy, Moreland claims that he had no connection to Meliorations or access to its bank accounts, that his clients did not deposit their money in Meliorations's accounts, and that his function in the organization was merely to invest funds. "However, the existence of an agreement may be inferred from circumstantial evidence." *United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), *overruled on other grounds by United States*

---

[4]The jury was properly instructed on these elements.

*v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc); *see also United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992) ("The government does not have to present *direct* evidence. Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction.") (emphasis in original). The evidence contradicts Moreland's contention.

The government introduced an overwhelming amount of evidence demonstrating Moreland's knowledge of the existence of the conspiracy and agreement to the conspiracy's objectives. Moreland worked with Zidar, Cravens, and Phillips to use foreign corporations and bank accounts to promote their fraud and hide their ill-gotten millions from the U.S. Government. A specific example is Cravens's testimony that the IBCs and Samoan bank accounts he set up specifically for Moreland (including the Millennium IBC and bank account) were set up to allow Zidar and Moreland to operate "privately and with the utmost secrecy," with the purpose of keeping money away from the government. Phillips testified that Zidar directed her to wire funds from Meliorations to Moreland's Millennium account in Samoa in order to keep the money away from the government. Agent Lawrence testified that new investor money was sent to Moreland's various accounts in the Bahamas, Samoa, and other locations, which money Moreland used to pay his Dexia and Millennium investors. Much more evidence was introduced at trial. Given the weight of the evidence, a rational juror could have found beyond a reasonable doubt that Moreland participated in the overall conspiracy to launder money and had knowledge of its objectives.

The evidence also supports the jury's finding beyond a reasonable doubt that the specific actions underlying the money laundering counts were committed in furtherance of the money laundering conspiracy while Moreland was a part of it, and that the offenses were reasonably foreseeable to Moreland. Regarding the promotion counts, Moreland knew that

sales agents were being paid commissions. In fact, Moreland himself received commissions from his sales. And the evidence indicates that Moreland knew that the enterprise was fraudulent. First, he knew it was not profitable and, second, he knew that funds from later investors were used to pay earlier investors. A rational juror could, therefore, find beyond a reasonable doubt that it was reasonably foreseeable to Moreland that commissions were being paid to agents in furtherance of the fraudulent conspiracy. Regarding the concealment counts, Moreland also knew that Zidar, Cravens, and Phillips were transferring funds out of the country to hide the funds from the government. And he knew about the existence and use of all four foreign bank accounts involved in the transfers. Thus, a rational juror could find beyond a reasonable doubt that the particular transactions alleged in Counts 33, 35, and 36 were committed in furtherance of the conspiracy while Moreland was part of it and were reasonably foreseeable to Moreland.

[15] There is ample evidence that Moreland participated in the overarching conspiracy with knowledge of its objectives. There is also sufficient evidence to conclude that the transactions forming the basis for the substantive charges were committed in furtherance of the conspiracy while Moreland was a member of the conspiracy and were reasonably foreseeable to Moreland. As a result, there is sufficient evidence to uphold Moreland's conviction on the substantive money laundering charges and the conspiracy charge.

III.

Moreland also appeals his revised sentence, arguing that the district court improperly relied upon facts not found by the jury in applying the now-advisory Sentencing Guidelines and that his sentence is unreasonable under 18 U.S.C. § 3553(a). "When we review a sentence, the first step is to determine if the district court made a material error in its Guidelines calculation that serves as the starting point for its sentencing deci-

sion. If there was material error in the Guidelines calculation, we will remand for resentencing, without reaching the question of whether the sentence as a whole is reasonable. If the district court committed no error in applying the Guidelines, we will next consider challenges to the reasonableness of the overall sentence in light of the factors specified in 18 U.S.C. § 3553(a)." *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006) (citing *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006)).

A.

First, Moreland claims that the district court erred in determining his sentence by relying on facts not found beyond a reasonable doubt by the jury in applying the Sentencing Guidelines. More specifically, Moreland objects to the district court's reliance on the Sentencing Guidelines calculation set forth in the Revised Presentence Report. The Revised Presentence Report increased Moreland's base offense level from 23 to 43 based, in part, on the value of the funds actually laundered in this case after Moreland's entry into the conspiracy —$55 million. Moreland complains that the district court violated his Fifth and Sixth Amendment rights by considering the amount of funds involved in the money laundering conspiracy because the government did not charge the amount of funds laundered in the indictment and the amount was not part of the jury's verdict. We review de novo whether a defendant's Fifth or Sixth Amendment rights were violated when a district court relied on facts not found by a jury in determining his sentence. *United States v. Dare*, 425 F.3d 634, 638 (9th Cir. 2005). We also review de novo whether the district court applied the correct standard of proof. *Id.*

Moreland's argument relies on the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely*, and *Booker*. In *Apprendi*, the Court held that, as required by the Sixth Amendment, facts that increase the penalty of a crime beyond the statutory maximum, other than the

fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. 530 U.S. at 490; *see also Blakely*, 542 U.S. at 303-04 (holding that the "statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted* by the defendant," and "*without* any additional findings" by the court). But the Court expressly limited its holding in *Apprendi* to "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." *Id.* at 490. In *Booker*, the Court relied on *Apprendi* and *Blakely* to conclude that the Sixth Amendment precludes a district court from enhancing a sentence based on extra-verdict findings in a mandatory sentencing regime. 543 U.S. at 230-33, 243-44. At the same time, the Court went on to reaffirm the principle that, "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Id.* at 233. The Court reiterated that position recently in *Rita v. United States*, 127 S. Ct. 2456 (2007), by stating that: "This Court's *Sixth Amendment* cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence. Nor do they prohibit the sentencing judge from taking account of the Sentencing Commission's factual findings or recommended sentences." *Id.* at 2465-66. Thus, the case law does not support Moreland's argument.

**[16]** In fact, we have specifically rejected Moreland's argument that a jury must find facts used to increase a defendant's sentence after *Booker*. In *United States v. Dupas*, 419 F.3d 916 (9th Cir. 2005), we held that the post-*Booker* advisory guidelines regime "still allows the sentencing judge (as distinct from a jury) to make the findings of fact necessary to determine the guideline range in the first place." *Id.* at 919; *see also United States v. Mix*, 457 F.3d 906, 914 (9th Cir. 2006). "[F]ollowing [*Booker*], district courts should resolve factual disputes at sentencing by applying the preponderance

of the evidence standard." *Kilby*, 443 F.3d at 1140. "As a general rule," therefore, even after *Booker*, "the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." *Dare*, 425 F.3d at 642. "However, 'when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction,' the government may have to satisfy a 'clear and convincing' standard." *Id.* (quoting *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999), quoting *United States v. Restrepo*, 946 F.2d 654, 659 (9th Cir. 1999) (en banc)).

**[17]** In calculating Moreland's offense level at 43 as recommended in the Revised Presentence Report, the district court found that the value of the funds laundered after Moreland's entry into the scheme was $55 million, that Moreland played a leadership and organizing role in the offense, that he abused a position of trust with respect to the investors, and that he obstructed justice by destroying documents, attempting to dispose of his laptop computer, and fleeing to Costa Rica during the investigation. The court found these facts by clear and convincing evidence, thus applying a burden of proof higher than necessary. There was no error in calculating the offense level or the applicable Guidelines range.

**[18]** As to Moreland's Fifth and Sixth Amendment claims, Moreland's sentence did not exceed the statutory maximums for the charges on which he was convicted. Thus, *Apprendi* is not implicated here. We held in *Dare*, 425 F.3d at 640 that "[t]he judge may select any sentence within the range, based on facts not alleged in the indictment or proved to the jury— even if those facts are specified by the legislature, and even if they persuade the judge to choose a much higher sentence than he or she otherwise would have imposed. That a fact affects the defendant's sentence, even dramatically so, does not by itself make it an element." The statutory maximums for the counts on which he was convicted by the jury are: 5 years for each of the three counts of mail fraud, 5 years for each of the three counts of wire fraud, 20 years for each of the two

counts of promotion money laundering, 20 years for each of the four counts of money laundering involving foreign transfers, 5 years for conspiracy to commit mail and wire fraud, and 20 years for conspiracy to commit money laundering. If the district court sentenced Moreland to the maximum for each count and ran the sentences concurrently, he could have received 20 years in prison. If the district court had chosen to run the sentences consecutively pursuant to U.S.S.G. § 5G1.2, he could have received a sentence of 175 years in prison. But the district court sentenced him to 18 years in prison—well within the applicable statutory maximums. Furthermore, the district court found the facts replied upon in the Revised Presentence Report by clear and convincing evidence. Therefore, the district court did not err in determining Moreland's sentence.

B.

Second, Moreland argues that the revised sentence is unreasonable under 18 U.S.C. § 3553(a). Moreland previously appealed his original sentence and, in light of the Supreme Court's decision in *Blakely*, a prior panel of this court remanded for resentencing under the now-advisory Sentencing Guidelines. On remand, the district court departed downward from the Sentencing Guidelines range recommended in the government's Revised Presentence Report and reduced Moreland's sentence from 292 months to 216 months in prison. Moreland now argues that the 216-month sentence is unreasonable because he was a first-time offender of a nonviolent offense, he was not as responsible for the criminal enterprise as his co-conspirators who pled guilty and received much lower sentences, and the district court improperly considered the amount of money involved in the conspiracy.

The district court explicitly considered the nature and circumstances of the offense, the seriousness of the offense, and the need to promote respect for the law, provide just punish-

ment, afford adequate deterrence, and protect the public. *See* 18 U.S.C. § 3553(a).[5]

The district court also gave substantial and detailed consideration to Moreland's objections. First, the court explicitly considered Moreland's comparative culpability and that he was a first-time offender of a nonviolent crime. The district court further found that Moreland's co-conspirators deserved their lower sentences due to their assistance to the government in putting together its case against Zidar and Moreland. For that reason, the district court found that Moreland's longer sentence was appropriate. The district court also explicitly considered the notion that the amount of money involved in the money laundering scheme increased Moreland's sentencing range. Finally, the district court noted an obvious "change" in Moreland's attitude toward the crime and acknowledgment of it that justified a downward departure. Namely, the court found that the two years in between the first sentencing and the resentencing had produced a "different person" who had had time to "introspect" on the "harsh

---

[5]Under § 3553(a), a district court "shall impose" a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). In doing so, the district court "shall consider":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

circumstances and . . . disastrous results" of his crimes and time in prison. Consequently, the district court exercised its discretion to lower Moreland's sentence from 24 to 18 years in prison, a sentence the court judged was sufficient, but not greater than necessary, to serve its purpose.

The district court's explanation of its reasoning was more than legally sufficient. "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 127 S. Ct. at 2468. As in *Rita*, "[t]he record makes clear that the sentencing judge listened to each argument. The judge considered the supporting evidence. The judge was fully aware of defendant's . . . ailments and imposed a sentence that takes them into account. *Id.*

**[19]** Given the seriousness of the crimes, the number of victims, the amount of loss, and Moreland's role in the conspiracy, the district court's decision to accept the Sentencing Guidelines range presented in the Revised Presentence Report was reasonable. The district court's decision not to depart downward given the disparity between Moreland's sentence and those of some of his co-conspirators was also reasonable. *See United States v. Caperna*, 251 F.3d 827, 831-32 (9th Cir. 2001) (leaving that decision to the discretion of the sentencing judge) a case involving the prosecution of a police officer for unreasonable use of force. Finally, the district court's decision to depart downward to 216 months, but not more, in consideration of the § 3553(a) factors, and in particular, Moreland's mental state, was reasonable. As a result, Moreland's sentence was reasonable under § 3553(a).

## IV.

Finally, Moreland appeals the district court's order imposing over $36 million in restitution. The legality of a restitution order is reviewed de novo, unless it is within the statutory

bounds, in which case we review for abuse of discretion. *United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004).

Congress passed the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. §§ 3663A-3664, as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, § 206, 110 Stat. 1232 (1996), and as a supplement to the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. § 3663. *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir. 2003). The MVRA makes restitution mandatory, without regard to a defendant's economic situation, to identifiable victims who have suffered physical injury or pecuniary loss from particular crimes, including offenses involving fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c), § 3664(f)(1)(A); *United States v. Mays*, 430 F.3d 963, 965 (9th Cir. 2005); *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004); and *United States v. Dubose*, 146 F.3d 1141, 1143 (9th Cir. 1998). The "primary and overarching goal" of the MVRA "is to make victims of crime *whole*, to *fully* compensate these victims for their losses and to restore these victims to their original state of well-being." *Gordon*, 393 F.3d at 1053 (internal quotations, citations, and emphasis omitted). For that reason, the statute "expressly directs the sentencing judge to award restitution in an amount equal to the value of the property on the date of the damage, loss, or destruction." *Id.* (internal quotation omitted). As such, the MVRA seeks "to restore the defrauded party to the position he would have had *absent* the fraud." *Id.* (internal quotation omitted).

[20] The procedures for identifying victims and the losses they sustained as a result of a defendant's criminal conduct are set forth in § 3664. The statute directs the sentencing court to order a probation officer to prepare a report providing "a complete accounting of the losses to each victim." 18 U.S.C. § 3664(a). To facilitate the preparation of this report, § 3664(d)(1) provides for the prosecutor, upon request of the probation officer, to consult with victims and, not later than

60 days before the sentencing date, to detail any losses subject to restitution. *Id.* § 3664(d)(1). Section 3664(d)(2) further provides that the probation officer, prior to submitting a report to the court, shall, to the extent practicable, provide notice of the court proceedings to all victims and afford them the opportunity to submit an affidavit detailing any losses subject to restitution. *Id.* § 3664(d)(2). "If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make [preparing the report] clearly impracticable, the probation officer shall so inform the court." *Id.* § 3664(a). Where victims' losses are not ascertainable by a date 10 days prior to sentencing, the prosecutor or the probation officer shall inform the court, and "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." *Id.* § 3664(d)(5). If a victim thereafter discovers losses that could not reasonably have been included in his or her initial claim for restitution, that victim may, within 60 days of discovering the loss, petition the court for an amended restitution order. *Id.*

In this case, the district court ordered restitution of approximately $36 million well after the 90-day limit had elapsed. At the time of Moreland's original sentencing, on August 23, 2003, and at the request of the prosecution, the district court deferred the issue of restitution pending a determination by a receiver of the identities of victims and the amounts of their losses. The receiver did not complete its determination until March 2005. By that time, Moreland had appealed his original sentence and a prior panel of this court had already remanded for resentencing. On remand, the district court entered a restitution order for over $36 million. That order was issued over two years after the original sentencing took place. Moreland argues that the district court lacked jurisdiction to order restitution on remand because it failed to do so within the 90-day time frame set forth in § 3664(d)(5). We disagree. Moreland's timing argument would abrogate an obligation to pay millions of dollars in restitution to thousands of defrauded victims.

Such an outcome would be antithetical to the purpose of the MVRA.

[21] The "intended beneficiaries" of the MVRA's procedural mechanisms "are the victims, not the victimizers." *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999). The legislative history reveals Congress's intent that the time limits in § 3664 not be relied upon for protection by defendants. *See United States v. Cheal*, 389 F.3d 35, 49 (1st Cir. 2004). In its report on the bill that would become the MVRA, the Senate Judiciary Committee explicitly refused to relate the statute's procedural framework to the interest of defendants, stating that the "sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 18 (1995), *as reprinted in* 1996 U.S.C.C.A.N. 924, 930, *quoted in Cheal*, 389 F.3d at 49. Consequently, we recognized in *United States v. Cienfuegos*, 462 F.3d 1160 (9th Cir. 2006), that " 'the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets.' " *Id.* at 1163 (quoting *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004)).

[22] Addressing two of the other timing requirements in § 3664 (the 10-day notice rule in § 3664(d)(5), and the 60-day requirement in § 3664(d)(1) regarding the amount of loss calculation), we held that § 3664's timing requirements are procedural, rather than jurisdictional. *United States v. Cienfuegos*, 462 F.3d 1160, 1162-63 (9th Cir. 2006). We concluded that the government's failure to comply with both of those requirements was subject to harmless error review. *Id.* This conclusion puts us in sync with the First, Second, Fourth, Sixth, and Seventh Circuits, which have held that § 3664's requirements are not jurisdictional. *See United States v. Cheal*, 389 F.3d 35, 49-50 (1st Cir. 2004); *United States v.*

*Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004); *United States v. Vandeberg*, 201 F.3d 805, 814 (6th Cir. 2000); *United States v. Johnson*, 400 F.3d 187, 199 (5th Cir. 2005); and *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999).[6]

In fact, Moreland's "jurisdictional argument is undermined by § 3664's provision for continued revision of the restitution order in light of later discoveries of losses." *Cheal*, 389 F.3d at 48. "The MVRA permits amendments to restitution order to reflect changed circumstances, and neither confers nor terminates the court's jurisdiction." *Vandeberg*, 201 F.3d at 814. If a district court's jurisdiction to order restitution did terminate after 90 days, the time limitation would "effectively nullify[ ]" the provision allowing for consideration of later-discovered losses. *Id.* Furthermore, the title of the provision itself—"Procedure for issuance and enforcement of order of restitution"—"advertises its procedural nature" and refutes the notion that § 3664(d)(5) is jurisdictional. *Cheal*, 389 F.3d at 48.

The legislative history also supports the notion that the "intended beneficiaries" of the MVRA's procedural mechanisms "are the victims, not the victimizers." *Grimes*, 173 F.3d at 639. The legislative history reveals Congress's intent that the time limits in § 3664 not be relied upon for protection of defendants. *See Cheal*, 389 F.3d at 49. In its report on the bill that would become the MVRA, the Senate Judiciary Committee explicitly refused to relate the statute's procedural framework to the interest of the defendants, stating that the "sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the

---

[6]*But see United States v. Farr*, 419 F.3d 621, 623 (7th Cir. 2005) (distinguishing *Grimes* and holding that the district court exceeded its authority under § 3664 to issue restitution because it did not do so within the 90-day time limit, where it did not order restitution as part of the defendant's original sentence, but three years later added restitution as a condition of defendant's supervised release).

basis of invalid premises or inaccurate information." S. Rep. No. 104-179 at 18 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 930, *quoted in Cheal*, 389 F.3d at 49. Consequently, we recognized in *Cienfuegos* that " 'the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets.' " 462 F.3d 1163 (quoting *Zakhary*, 357 F.3d at 191).

**[23]** For that reason, in *Cienfuegos*, we concluded that "because the procedural requirements of section 3664 were designed to protect victims, not defendants, the failure to comply with them is harmless error absent actual prejudice to the defendant." 462 F.3d at 1163; *see also Zakhary*, 357 F.3d at 188 ("[F]ailure to determine losses within the § 3664(d)(5) time period will be deemed harmless error unless a defendant can show actual prejudice from the delay . . . . [A] presumption of harmlessness applies to any error in the timely identification of victims' losses."). Here, Moreland "cites no prejudice from the delay in entering the restitution order." *Cheal*, 389 F.3d at 48. For example, Moreland does not claim that any documents or witnesses had become unavailable after the 90-day period elapsed, or that his financial status changed. *See United States v. Stevens*, 211 F.3d 1, 6 (2d Cir. 2000). Indeed, Moreland does not even allege that the delay caused any prejudice to his defense whatsoever. *See id.* at 6. In *Cienfuegos*, we held that the defendant failed to show prejudice, in part, because he had "the functional equivalent of notice" under § 3664(d)(5)'s requirements, since restitution was part of his plea agreement. 462 F.3d at 1163. Likewise, here, Moreland was aware that an order of restitution would be part of his sentence, as the district judge noted it on the record during the original sentencing hearing but deferred the calculation of the amount and identification of the victims at the prosecution's request. Thus, Moreland also had notice that the restitution order would later be imposed. Finally, Moreland was aware of the large amount of funds at issue based on the

district court's findings to support the sentencing calculation. Therefore, the district court's error in failing to comply with the 90-day time limit was harmless. *See id.*

**[24]** Finally, the prosecution did not waive its right to seek restitution, as Moreland suggests. As an initial matter, restitution under the MVRA is not a right to be sought or waived by a prosecutor. Rather, as the name of the statute suggests, restitution is *mandatory* where the MVRA applies. Even so, in this case, the prosecution requested restitution in its original sentencing memorandum to the district court. At the prosecution's request, the court deferred ordering restitution until the receiver finished its report on victims' losses. Moreland's waiver argument is therefore undermined by both the record and the mandatory nature of the statute.

V.

We conclude that none of the claims raised in Moreland's appeal warrants reversal.

**AFFIRMED.**